2024 IL App (2d) 230232
Nos. 2-23-0232 & 2-23-0456
Opinion filed September 24, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 19-CF-433 |
| LEONARD J. ZERBST, | ) ) ) | Honorable Paul B. Novak, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Justices Hutchinson and Kennedy concurred in the judgment and opinion.

**OPINION**

¶ 1 Defendant, Leonard J. Zerbst, appeals orders entered by the circuit court of Lake County pursuant to section 104-25 of the Code of Criminal Procedure of 1963 (Procedure Code) (725 ILCS 5/104-25 (West 2022)) in consolidated cases Nos. 2-23-0232 and 2-23-0456. The trial court found that defendant remained unfit and should be placed in a secure setting because he constitutes a serious threat to the public safety (*id.* § 104-25(g)(2)) and determined, based on regular reviews, that he was in need of further inpatient mental health treatment (*id.* § 104-25(g)(2)(i)(B)). Defendant argues that the trial court misinterpreted section 104-25 of the Procedure Code, which led to his improper commitment, and that the court's determination that he required inpatient mental health treatment was against the manifest weight of the evidence. We affirm.

¶ 2                          I. BACKGROUND

¶ 3      On March 2, 2019, defendant was stopped for a traffic violation. The officer noticed an odor of burnt cannabis and, upon questioning, defendant admitted that he had smoked cannabis earlier that evening. A search of the car led to the discovery of a bag of cannabis in the center console, a knife and a blunt in the driver's door compartment, and a loaded and cocked handgun under the driver's seat. The handgun's serial number was unreadable, having been drilled out. Defendant did not possess a valid Firearm Owner's Identification (FOID) card or a license permitting concealed carry of firearms, and he was placed under arrest.

¶ 4      On March 20, 2019, defendant was indicted for unlawful possession of a weapon by a felon (720 ILCS 5/24-1.1(a) (West 2018)) (count I), possession of a defaced firearm (*id.* § 24-5(b)) (count II), possession of a firearm without a FOID card (430 ILCS 65/2(a)(1) (West 2018)) (count III), aggravated unlawful use of a weapon (720 ILCS 5/24-1.6(a)(1), (a)(3)(C) (West 2018)) (count IV), and aggravated unlawful use of a weapon (*id.* § 24-1.6(a)(1), (a)(3)(A-5)) (count V). On May 8, 2019, defendant was indicted with an additional charge: being an armed habitual criminal (*id.* § 24-1.7(a)) (count VI).

¶ 5      On May 9, 2019, the trial court determined that there was a *bona fide* doubt as to defendant's fitness to stand trial and ordered that he undergo a mental health and fitness evaluation. Dr. Anthony Latham conducted the evaluation. Latham noted that defendant had not exhibited behavioral disturbances while held in the county jail but he had complained that a "computer bug" had been placed inside his body and was influencing his behavior, trying to kill him, and causing auditory hallucinations and sleeplessness. On May 21, 2019, Latham filed a written report opining that defendant was unfit and recommending that he be placed into an inpatient setting for psychiatric and fitness restoration treatment.

¶ 6    On May 28, 2019, the trial court entered a formal finding that defendant was unfit to stand trial or enter a plea. Defendant was ultimately placed into the custody of the Illinois Department of Human Services (Department) and remanded to the Elgin Mental Health Center for treatment. During the next year, defendant's periodic reviews opined that he remained unfit. Defendant began to complain that someone had injected "green goo" into his head. Objective testing and medical imaging revealed no abnormalities. When confronted with this result, defendant's belief persisted. Behaviorally, defendant refused to take psychiatric medications and, after November 2019, stopped attending the fitness restoration treatment sessions because he believed he was fit and knew the information being presented. Defendant was sedated when his behavior alarmed hospital staff during testing related to his complaint that green goo had been injected; otherwise, while at the Elgin Mental Health Center, defendant presented few behavioral issues.

¶ 7    On February 4, 2020, defendant's treating psychiatrist, Dr. Madhurita Malhotra, filed a report opining that defendant was fit to stand trial with accommodations. The trial court subsequently determined that defendant was restored to fitness, but on February 20, 2020, defendant's appointed counsel reported to the court concerns about defendant's fitness. Counsel believed that Malhotra's opinion was flawed because nothing had changed; defendant continued to present the same symptoms, delusional beliefs, and conduct that led to his original unfitness finding. The trial court accepted counsel's concerns and determined, again, that there was a *bona fide* doubt as to defendant's fitness, and it ordered a new fitness evaluation. On March 6, 2020, Latham completed this evaluation. Latham opined that defendant was unfit because defendant's delusional belief about the green goo and his refusal of psychiatric treatment and medications interfered with his ability to process and to assist in his defense. On March 10, 2020, the trial court found defendant to be unfit and ordered him to be reevaluated by the Department for placement to receive appropriate services.

¶ 8    On March 27, 2020, the Department completed its assessment and determined that the Elgin Mental Health Center would be the appropriate facility, but defendant's transfer to that facility was delayed until July 22, 2020, due to the COVID-19 pandemic. During the period from March to July 2020, defendant sent letters and *pro se* motions to the trial court. The court notified the State and defense counsel of the filings as they occurred and, due to defendant's unfitness, placed the documents into the court file.

¶ 9    From his second admission until September 2020, defendant's delusion about the green goo persisted. Defendant had no reported behavioral incidents with either staff or other patients, but he continued to refuse treatment and medication due to his belief that he did not suffer a mental illness. In addition, the treating psychiatrist remarked that defendant continued to lack insight into his mental illness, which was impeding defendant's progress in restoring his fitness for trial.

¶ 10   On November 5, 2020, defendant filed a motion for a discharge hearing, arguing that more than a year had elapsed since the May 2019 finding of unfitness. On December 15, 2020, the trial court determined that, because of the February 2020 finding of fitness, the one-year term for restoration efforts began on March 10, 2020, and it denied defendant's motion for a discharge hearing.

¶ 11   The Department's 90-day progress reports indicated that defendant remained unfit. He occasionally took medication for sleep but refused any psychotropic medications that might treat his condition. The reports noted that defendant was becoming "increasing[ly] hostile" and had a few verbal confrontations with other patients and staff, with two confrontations requiring the administration of medication to calm defendant. The reports further opined that defendant's choice to cooperate with his attorney had been compromised because the attorney did not believe that defendant had been injected with something. Based on defendant's lack of progress and refusal to participate in psychiatric or restoration treatment, the treating psychiatrist ultimately concluded in

the February 2021 progress report that defendant could not be restored to fitness within the one-year time frame.

¶ 12    On March 1, 2021, defendant sent a letter to the court requesting release to an outpatient program. Defendant noted that his prior criminal convictions were followed by a long period of time during which he pursued education and obtained stable employment. Defendant also noted that the emergency precautions taken due to the COVID-19 pandemic had prolonged his incarceration.

¶ 13    On March 11, 2021, defense counsel filed a motion for a discharge hearing. Over the next six months, the Department issued two 90-day progress reports. The treating psychiatrist concluded that defendant remained unfit due to his delusion about the green goo and that, apart from his delusional belief, was otherwise high functioning. However, sometime between May and August 2021, defendant was administered emergency medication after threatening a staff member.

¶ 14    On September 28, 2021, the trial court held the discharge hearing (the delay between the motion and the hearing was due in significant part to quarantine restrictions at the Elgin Mental Health Center). The evidence indicated that defendant was arrested after his car was stopped and searched and a handgun was found.  Tests performed on the physical evidence found defendant's genetic material on the handgun, and photographs showed that the serial number of the handgun had been rendered unreadable. The State also introduced defendant's prior felony convictions: a burglary in 2000 and unlawful possession of a weapon by a felon in 2011. The trial court found defendant "not not guilty." The court remanded defendant to the Department's custody for further treatment for the maximum statutory period of two years, which would end March 8, 2023.

¶ 15    During the term of extended treatment, defendant's behavior was generally appropriate. Reports in April 2022 and September 2022 observed that defendant was sometimes disrespectful

and impatient with his social worker, he was otherwise quiet and calm, and he managed to be sociable with the other patients.

¶ 16   Throughout the term of extended treatment, defendant's mental condition did not change. Around August 2022, defendant stopped attending treatment groups, but he continued attending monthly appointments with his treatment team and individual appointments with his psychologist. Defendant routinely stayed up all night playing video games. Defendant persisted in denying any mental illness, instead attributing his condition to the physical introduction of green goo into his head. Defendant was reluctant to participate in the final fitness evaluation, explaining that he feared he would again go to court only to be remanded back into the Department's custody and placed in the Elgin Mental Health Center. Defendant steadfastly refused to take psychotropic medication and, while staff encouraged him to take medication, nothing in the record indicates that staff sought legal authorization to involuntarily administer psychotropic medication to defendant.

¶ 17   Defendant's extended treatment period was scheduled to expire on March 8, 2023. Because of the impending deadline, on February 28, 2023, the trial court held a discharge hearing pursuant to section 104-25(g)(2) of the Procedure Code (subsection (g)(2) hearing) (725 ILCS 5/104-25(g)(2) (West 2022)). Dr. Tahseen Mohammed, who was then defendant's treating psychiatrist at the Elgin Mental Health Center, testified that, since February 2022, he had been treating defendant and was effectively the leader of defendant's treatment team. In preparation for his testimony at the subsection (g)(2) hearing, Mohammed reviewed defendant's file, which included records from the jail, police arrest reports, court services reports, and the reports from staff and other physicians and psychiatrists from the Department and the Elgin Mental Health Center. Mohammed routinely observed defendant a few times a week during his rounds in the unit, and he had formal treatment and evaluation appointments with defendant every "one or two months." Mohammed noted that defendant's attendance at therapeutic group sessions was poor

because defendant denied having a mental illness.

¶ 18 Regarding defendant's mental health issues, Mohammed testified that defendant was delusional due to a persistent and unwavering belief that someone had injected green goo into his head, despite objective evidence repeatedly refuting that belief. Mohammed also ruled out malingering, because defendant's symptoms remained consistent over time and they began before defendant was arrested. When Mohammed met with defendant, he was guarded and would respond only in brief sentences, which Mohammed believed to suggest that the disorder was interfering with defendant's ability to communicate. Defendant's abnormal sleep habits were also possibly symptomatic of mental illness. Finally, defendant refused medication that would treat his mental illness, because he did not believe that he had a mental illness.

¶ 19 Mohammed reviewed defendant's records and was aware of defendant's criminal and carceral history. Mohammed emphasized that, in psychiatry, past history is the biggest predictor of future behavior and he was careful to take this into account in his opinion. Mohammed characterized defendant's criminal history as violent, which he said is "very significant for a high risk of future potential for violent crime." Mohammed diagnosed defendant with delusional disorder, mixed type, explaining that defendant experienced different types of delusions—both persecutory and somatic. Mohammed opined that defendant needed to continue inpatient care, based on seven factors he outlined: (1) defendant had a serious and major mental illness; (2) defendant denied he had a mental illness; (3) because of the denial, he had no insight into his mental illness or any steps to recover from it; (4) defendant refused to take medication to treat his mental illness; (5) defendant refused to follow any treatment recommendations for his mental illness, including those short of medication; (6) defendant had "a prior history of violent crimes"; and (7) defendant had exhibited aggressive behaviors while at the Elgin Mental Health Center.

¶ 20    Mohammed amplified the point about aggressive behavior. According to Mohammed, three instances when defendant had verbally threatened a staff member or a patient resulted in the administration of medication to calm defendant. This translated to a high risk of inflicting harm upon others if released from inpatient care.  Mohammed explained that, because defendant was in a very controlled environment exhibiting aggression and irritability, in an uncontrolled environment, he could be expected to become overstimulated which would lead defendant to overreact or to become paranoid due to his delusional beliefs and harm someone due to a mistaken perception of a threat.

¶ 21    On cross-examination, Mohammed agreed that the 90-day progress reports would be expected to document any clinically significant behavior, including violence or changes in defendant's mental status. He cautioned, however, that the progress reports were only a snapshot observation at the time of the evaluation and that some events may not have been memorialized. Mohammed conceded that, according to the two most recent 90-day progress reports, no instances of aggression or violence were reported. Mohammed also conceded that he had not personally witnessed defendant harm anyone or exhibit any aggressive behavior. Likewise, during the year that defendant had been under Mohammed's care, Mohammed had received no reports that defendant exhibited violence or aggressive behavior warranting the administration of medication to calm him. Mohammed conceded that the aggressive behavior to which he referred on direct examination occurred before defendant came under his care.

¶ 22    Mohammed was asked on cross-examination to explain what he meant when he had testified that defendant had displayed irritability. Mohammed agreed that, while defendant displayed irritability about participating in group sessions, he had not become violent during those groups. Defendant had also displayed irritability toward staff at the Elgin Mental Health Center about his personal belongings and the limitations the staff enforced. Mohammed eventually agreed

with defense counsel's characterization that, instead of aggression, defendant displayed rudeness and disrespect to his social worker when complaining about the limitations to his personal property.

¶ 23     Mohammed also conceded on cross-examination that he could not recall the facts from defendant's 2000 burglary and did not know whether the offense involved strictly property or involved other persons. Likewise, Mohammed agreed that the 2011 firearm possession did not include physical violence. Further, Mohammed agreed that he could not identify any specific acts of physical violence in defendant's criminal history, which included about a 10-year gap between instances of criminal charges.

¶ 24     Mohammed explained on cross-examination that defendant, like other patients under his care, was  unfit to stand trial and all had major mental illnesses. Thus, their unit could become chaotic when patients acted out or became violent. Mohammed worried that, if defendant were released from inpatient care, he would likely escalate his negative behavior when confronted with the unstructured behavior of others, which would likely lead to defendant engaging in aggression and, ultimately, violence. Mohammed noted that, when defendant exhibited irritability and annoyance in the unit, the staff successfully defused and de-escalated the situation, so defendant had not actually become violent. Nevertheless, Mohammed expressed his strong concern that defendant could become violent if released into an unstructured and untrained setting, especially when he did not get his way.

¶ 25     Following the parties' examinations, the trial court asked Mohammed whether defendant's refusal to engage in treatment and take medication was a "major factor" in his opinion regarding defendant. Mohammed said it was.

¶ 26     Following Mohammed's testimony, the parties rested and presented argument. Defense counsel argued generally that Mohammed's testimony did not demonstrate that defendant was

violent but demonstrated only that he was rude, disrespectful, and ill-mannered. The trial court interjected, asking the defense to clarify its position on what was required to be proved under section 104-25(g)(2) and to specifically comment on the portion regarding "constitutes a serious threat to public safety."[1] Defense counsel responded: "Judge, my analysis is slightly different, but I can shift it to that. My analysis is that it's an either or, that he or she are subject to involuntary admission under the Mental Health and Developmental Disabilities Code or constitutes a serious threat to public safety." Similarly, the court asked the State to clarify what it was arguing: whether defendant was subject to involuntary admission under the Mental Health and Developmental Disabilities Code (Mental Health Code) (405 ILCS 5/1-100 *et seq.* (West 2022)) or constituted a serious threat to public safety. The State responded that it did not need to elect one or the other; rather, it needed to present evidence that satisfied at least one of the statutory avenues in order to carry its burden.

¶ 27    Following the parties' arguments, the trial court found that defendant constituted a serious threat to public safety and ordered him remanded to the Department for further treatment. Specifically, the court stated:

> "In Dr. Mohammed's testimony, in his medical opinion he believes that the Defendant does pose a threat to public safety; and in support of that, he listed a number of different items a few different ways; but he listed them including that the Defendant failed

---

[1]Section 104-25(g)(2) specifically provides, "If the defendant continues to be unfit to stand trial, the court shall determine whether he or she is subject to involuntary admission under the Mental Health and Developmental Disabilities Code [(405 ILCS 5/1-100 *et seq.* (West 2022))] or constitutes a serious threat to the public safety." 725 ILCS 5/104-25(g)(2) (West 2022).

to attend treatment, that [he] has a history of violent crime, that he has a serious mental illness, no insight as to his mental illness, a prior history of aggression, and a few incidents at Elgin [Mental Health Center].

So I think defense counsel did an excellent job at cross-examining the doctor as to what appears to be some remote, some remote instances; but the Court is still left with what the nature of this case is. This case is possession of a weapon by a felon; and we are dealing with someone that is refusing to engage in treatment, that staff feels they have to disengage from him in order to stop escalation; and I believe the testimony [showed] that was because he was not involved with services, that he was not taking medication, that that was the method best suited for the situation.

So, that leads me to believe that if he was involved with treatment and learning tools and taking possible medication if that was appropriate, that then he would then learn how to de-escalate himself and not require staff to de-escalate for him; and that seems to be the crux of the State's case, and it bodes the question of the doctor's opinion, his expertise, I believe satisfies the statute as to a serious threat to public safety; and that's based on the nature of the offense, and what we have in this situation is potentially an unfit defendant possessing a weapon.

That I believe poses a serious threat to public safety; and so for those reasons, I do believe that the order or the statute (g)(2) has been met by clear and convincing evidence that the Defendant does constitute a serious threat to public safety; that he should be remanded to the [Department] for further treatment and shall be treated in the same manner as a civilly committed patient for all purposes and that any approved conditional release or discharge of the Defendant shall be approved by the Court; that he should be placed in a secure setting by the [Department]."

The court entered a preprinted written order in which it checked boxes finding that defendant remained unfit and, under section 104-25(g)(2) of the Procedure Code, should be placed in a secure setting by the Department because he "constitutes a serious threat to the public safety."

¶ 28    On March 28, 2023, defendant timely filed a motion to reconsider, arguing that the State failed to prove by clear and convincing evidence "either that [he] was subject to involuntary admission under the [Mental Health Code] or that he constituted a serious threat to the public safety, and the Court erred in finding that he did present a serious threat to public safety." Defendant argued that Mohammed's testimony was not borne out by the record regarding whether he had any history of aggressive or violent behavior and that the court's reliance on the purported aggression at the Elgin Mental Health Center was unsupported in the record, where any aggression happened before Mohammed began caring for defendant and did not represent any current threat to the public safety.

¶ 29    On July 6, 2023, the trial court denied defendant's motion to reconsider. The court expressly noted that, in his motion to reconsider, defendant challenged the trial court's reliance on and conclusions from evidence presented bearing solely on whether defendant constituted a serious threat to the public safety. The court, considering the totality of the circumstances, determined that its previous ruling was correct. On July 11, 2023, various counsel filed three notices of appeal in case No. 2-23-0232. Trial counsel filed a notice of appeal appealing the July 6, 2023, order denying defendant's motion to reconsider. Appellate counsel filed a notice of appeal appealing the February 28, 2023, order following the subsection (g)(2) hearing placing defendant in the custody of the Department for further inpatient treatment, but it characterized the order as the denial of the motion

to reconsider. Finally, appellate counsel filed an amended notice of appeal appealing a purported July 11, 2023, order, and again characterized it as the denial of a motion to reconsider.[2]

¶ 30    On July 6, 2023, the trial court also considered the Department's 90-day progress report. The report was approved, and the court found that defendant remained unfit and in need of inpatient treatment.

¶ 31    On September 19, 2023, the trial court held a hearing pursuant to section 104-25(g)(2)(i) of the Procedure Code (725 ILCS 5/104-25(g)(2)(i) (West 2022)) (180-day hearing), to review defendant's progress and determine whether he needed continued mental health treatment. Mohammed testified that, in May 2022, he began treating defendant and his care of defendant continued until August 2023, when defendant was transferred to another psychiatrist's care. Mohammed explained that, in March 2023, defendant met with him and expressed his dissatisfaction with Mohammed's testimony in the subsection (g)(2) hearing and stated that he did not want to be treated any longer by Mohammed. Thereafter, defendant refused to meet with Mohammed during the monthly treatment team meetings. Defendant also began to refuse to participate in all treatment programs, both fitness restoration and mental health. Defendant continued to meet with staff, however, to address personal needs.

¶ 32    Mohammed testified that defendant continued to deny that he was mentally ill and was not currently taking any psychotropic medications to treat his issues; occasionally he would request Benadryl as a sleep aid.

_____

[2]We note that the only July 11, 2023, order appearing in the record appoints appellate counsel and does not deal with the substantive merits of either the February 28, 2023, judgment following the subsection (g)(2) hearing or the July 6, 2023, denial of the motion to reconsider.

¶ 33    Mohammed noted that, in March 2023, he discussed the possible benefits of medications to aid in defendant's recovery but, since defendant terminated contact with him, they had not revisited the topic. Defendant's delusions about green goo—which continued to persist despite testing by at least two other doctors that confirmed defendant had no physical issues—impeded his ability to progress in his treatment. While Mohammed believed that work with a psychologist alone could help defendant work through those issues, he would benefit if he were also receiving medication when working with the psychologist. Further, defendant had developed no insight into his mental illness and continued to refuse medications.

¶ 34    On July 8, 2023, defendant engaged in a verbal altercation with his roommate that required the intervention of security staff. The altercation did not escalate into a physical one. Defendant requested to be moved to a different room and was. On August 1, 2023, another patient complained that defendant was being verbally abusive toward him. Later, defendant threatened to break that patient's television set. When questioned, defendant told staff that the patient had been calling him racist names.

¶ 35    Mohammed once again testified about his belief in past behavior predicting future behavior, and he noted that the entire treatment team had carefully evaluated the pertinent circumstances to predict whether, in the future, defendant would engage in violent conduct. During the relevant review period for the 180-day hearing, defendant had refused to engage with the treatment team, forcing Mohammed to rely on defendant's history rather than interactions with defendant. Mohammed opined that defendant had regressed following the outcome of the subsection (g)(2) hearing and was less successful managing his anger and aggression. In his description of defendant's rising aggression, Mohammed included defendant's refusal to engage with the treatment team as well as his verbal altercations in July and August 2023.

¶ 36    Mohammed opined that defendant posed a threat to the community outside of a controlled environment. He based his opinion on the following factors: (1) defendant had a major mental illness; (2) he denied that he had any mental illness; (3) he refused medication to address the mental illness; (4) he was refusing all treatment interactions—fitness restoration, individual therapy, and group therapy; (5) his criminal history included violent offenses; and (6) he had recently displayed aggressive behaviors even though he had resided in a controlled environment for the previous three years. Mohammed commented that, because defendant could not consistently de-escalate when he became agitated, he remained at high risk of escalating his behavior into violence if he were placed in an uncontrolled environment. Moreover, defendant was unlikely to seek treatment if he were released into the community.

¶ 37    On cross-examination, defense counsel extensively questioned Mohammed about the bases for his opinion. For example, counsel highlighted defendant's successes, such as earning rewards in an incentive program—demonstrating his engagement and compliance with the treatment program—but Mohammed explained that the incentive program was of little therapeutic value. Similarly, counsel established that a patient's mental illness did not necessarily translate into physically violent behavior. Mohammed conceded that defendant demonstrated adequate knowledge and understanding of the legal process and his charges, which was a major focus of his psychologist's duties in the treatment regime.

¶ 38    The trial court questioned Mohammed directly. In response to the court's question regarding what steps defendant needed to undertake to move forward, Mohammed opined that defendant needed to attend his team meetings regularly and to begin taking recommended medication, all of which would advance his fitness treatment.

¶ 39    Following Mohammed's testimony, the State argued that defendant held the keys to his release if he would cooperate with treatment and his treaters' recommendations. The State noted

that nothing had changed since the subsection (g)(2) hearing—defendant continued to experience a serious mental illness and, by refusing to cooperate with his treatment, he had no insight into his mental illness. In addition, defendant had exhibited increasing aggression over the six months between the subsection (g)(2) hearing and the 180-day hearing. The defense argued that, rather than focus on defendant's progress in his treatment, the trial court needed to focus on whether defendant was reasonably expected to inflict physical harm upon himself or others in the near future. Counsel disputed whether any evidence had been presented regarding specific instances of physical violence and asserted that the opinion that defendant remained a threat for physical violence was unfounded.

¶ 40    The trial court found, by clear and convincing evidence, that defendant was in need of inpatient mental health treatment. The court stated:

"The Court has listened to the testimony of Dr. Mohammed, reviewed the reports for today's court appearance as well as listened to the arguments of counsel, and the Court will rule as follows: That the Court, as I indicated on the last 90-day hearing [*sic*] that [defendant] has the keys to his future. The reason I asked the questions of the doctor the way I did at the very end was the doctor reported to me he is of the opinion that [defendant] has the capability to be released, and that is because the doctor believes that if [defendant is] on medication, that if he's cooperative with treatment and in essence successfully completes the treatment, that that would cure the safety risk to the public, and that's what this case is about; that's what this finding was.

The charge is that he possessed a weapon while being a felon, and so although possession of a weapon is not a violent offense itself, possessing of a weapon—possession of a weapon leads to violence, and so the fact that he was stopped on the street prior to being able to use that weapon is an important factor. It's also an important factor that since

the last court date or the last hearing, I specifically told the defendant that he did have the keys to his future, and what he did was regress in the doctor's opinion, that he stopped going to the non-remedial groups, that he stopped meeting with psychiatrists and psychologists.

So I don't think anything has changed since the last hearing, but I will say this, it sounds like that you have a new opportunity. You have a new psychiatrist starting. You can create a new relationship with that psychiatrist, and hopefully you can learn what you need to learn and cooperate like you need to cooperate so you can be released.

I can tell you I don't want to keep you here. I don't. But if you don't cooperate, you leave me no choice. If you cooperate, if you go to the groups, if you're meaningfully involved in the groups, if you talk to your doctors and they can help you address the issues you need to address, you will be released.

And I'm not saying it's going to happen tomorrow, but you will be released based on the doctor's opinion that he told us and he told you that if you do those things, you can be released. And so to me, that's the important thing that can't get lost in the situation is although the defendant shouldn't dictate who his treatment team is, the department did eventually switch to a different doctor, and he now has a golden opportunity to take advantage of that.

And so I hope that he does take advantage of that, and at our next 90-day hearing, if it's that long, that we hear how great you're doing and then your attorney has a much better argument for your release. And so the Court does find that the treatment shall expire at this point in March of 2034. That's the maximum sentence the Court finds by clear and convincing evidence that the defendant is in need of mental health services in the form of inpatient care."

¶ 41 Also on September 19, 2023, the trial court entered a written order. The order was again a preprinted form order, and the court checked the boxes corresponding to its judgment in the 180-day hearing. Pertinently, the court checked the following: "The court finds by clear and convincing evidence that the defendant continues to be: in need of mental health services in the form of inpatient care."

¶ 42 On October 18, 2023, trial counsel filed a notice of appeal, docketed as case No. 2-23-0456, specifically identifying the September 19, 2023, judgment order from the 180-day hearing. On October 31, 2023, the trial court appointed defendant's appellate counsel in case No. 2-23-0232 to represent defendant in the appeal of the judgment order from the 180-day hearing. On November 1, 2023, appellate counsel filed a notice of appeal describing the order appealed to be the judgment order from the 180-day hearing but giving the date of that order as October 31, 2023. Similar to appellate counsel's amended notice of appeal in case No. 2-23-0232, the only order entered on October 31, 2023, was the appointment of appellate counsel to represent defendant in his appeal of the judgment order from the 180-day hearing.

¶ 43 On January 3, 2024, defendant filed an unopposed motion to consolidate the appeals in case Nos. 2-23-0232 and 2-23-0456. On January 5, 2024, we granted the motion and consolidated the two appeals.

¶ 44                                    II. ANALYSIS

¶ 45 On appeal, defendant argues that the trial court erred in construing section 104-25(g)(2) of the Procedure Code. He specifically contends that the options available to the trial court after a subsection (g)(2) hearing depend on the basis for the continued finding of unfitness: defendants who are unfit due to a mental condition are remanded to the Department only if they meet the criteria for involuntary admission under the Mental Health Code, while defendants who are unfit due solely to a physical condition are remanded to the Department only if they constitute a serious

threat to the public safety. Based on this interpretation of the provision, defendant argues that the evidence presented at the subsection (g)(2) hearing failed to establish that he was subject to involuntary admission under the Mental Health Code, as he was found unfit due to a mental condition. Defendant also argues that the court erred in finding, after the 180-day hearing, that he continued to be in need of inpatient mental health treatment.

¶ 46                                              A. Jurisdiction

¶ 47     Counsel representing defendant filed five notices of appeal in these two consolidated cases. Defendant does not remark on this abundance, and the State affirmatively notes that the notices fairly apprised it of the orders being appealed; therefore, it believes that we have jurisdiction, noting, however, that we have an independent duty to consider whether we indeed have jurisdiction. See *Village of Kirkland v. Kirkland Properties Holdings Co.*, 2023 IL 128612, ¶ 37 (a reviewing court has an independent obligation to consider jurisdiction because it is a threshold matter that must be determined before an appeal's merits may be addressed). Thus, we must first consider whether some or all of the various notices of appeal conferred jurisdiction, and, if so, jurisdiction over which orders defendant seeks to appeal.

¶ 48     Beginning with case No. 2-23-0232, all three notices of appeal were timely filed within 30 days of the orders they were seeking to appeal or within 30 days of the resolution of the last remaining postjudgment motion directed against the judgment. See Ill. S. Ct. R. 303(a)(1) (eff. July 1, 2017). Trial counsel's notice of appeal specified the July 6, 2023, denial of defendant's motion to reconsider as the order being appealed. Appellate counsel's original notice of appeal specified the February 28, 2023, judgment order from the subsection (g)(2) hearing as the order being appealed, although it erroneously described it as a denial of the motion to reconsider. Finally, appellate counsel filed an amended notice of appeal specifying a July 11, 2023, denial of a motion to reconsider as the order being appealed.

¶ 49    Generally, the notice of appeal is to inform the prevailing party that the other party seeks review of the trial court's decision, and a notice of appeal should be considered as a whole and will be deemed sufficient where it fairly and adequately sets out the judgment complained of and the relief sought, thereby advising the prevailing party of the nature of the appeal. *Village of Kirkland*, 2023 IL 128612, ¶ 39. Moreover, the notice of appeal is to be liberally construed so that deficiencies in form as opposed to substance will not deprive the reviewing court of jurisdiction. *Id.* ¶¶ 38-39. Further, an amended notice of appeal may be filed within the original 30-day period without leave of court and within 30 days of the expiration of the original 30-day period upon leave of court. Ill. S. Ct. R. 303(b)(5) (eff. July 1, 2017). The purpose of an amended notice of appeal is to allow the appealing party to correct omissions from the original notice of appeal. *In re Marriage of Betts*, 200 Ill. App. 3d 26, 42 (1990).

¶ 50    We have not found a case in which multiple notices of appeal were filed on behalf of the appellant by multiple attorneys. Given the liberal construction applied to a notice of appeal and the implication of *Betts* (*id.* at 42)—that amendments to a notice of appeal are deemed to supplement the existing notices of appeal rather than supersede them—we believe that trial counsel's notice of appeal and appellate counsel's first notice of appeal are best deemed to be an original notice of appeal and an amended notice of appeal. In that vein, it is clear that defendant intended to and did appeal the February 28, 2023, judgment order from the subsection (g)(2) hearing and the July 6, 2023, denial of the motion to reconsider.

¶ 51    Appellate counsel's amended notice of appeal in case No. 2-23-0232 presents an entirely different issue. There, counsel specified a nonexistent July 11, 2023, denial of a motion to reconsider. Indeed, the only order entered on July 11, 2023, was the order appointing appellate counsel to represent defendant in this appeal. *Betts* holds that an amended notice of appeal only supplements any original notice of appeal by supplying omissions from the original. *Id.* As there

is no corresponding order, we cannot say that the amended notice of appeal was effective to confer jurisdiction. We therefore hold that the amended notice is ineffective and invalid, but this does not affect our jurisdiction over the February and July 2023 orders properly specified in the other two notices of appeal. Accordingly, we conclude that we fully have jurisdiction over the issues in case No. 2-23-0232.

¶ 52    In case No. 2-23-0456, on September 19, 2023, the trial court delivered its judgment order from the 180-day hearing. On October 18, 2023, trial counsel filed a notice of appeal specifying that order. On October 31, 2023, the court appointed appellate counsel to represent defendant in this appeal. On November 1, 2023, appellate counsel filed a notice of appeal specifying an October 31, 2023, order as the order being appealed and describing it as the judgment from the 180-day hearing.

¶ 53    Trial counsel's October 18, 2023, notice of appeal is both timely and sufficient to confer jurisdiction over the 180-day hearing judgment order. Appellate counsel's notice of appeal is outside of the 30-day time period and would ordinarily simply be untimely and ineffective. However, as discussed above, different notices of appeal from different attorneys filed on behalf of the same appellant may be considered an amended notice of appeal. Here, appellate counsel's notice would occupy the position of an amended notice of appeal, as it was clearly filed after trial counsel's original notice of appeal. There is still a problem, however, because an amended notice of appeal may be filed without leave of court only within the original 30-day period and it may be filed with leave of court for an additional 30 days thereafter. Ill. S. Ct. R. 303(b)(5) (eff. July 1, 2017). No motion for leave to file an amended notice of appeal, either written or verbal, is in the record. Had such leave been granted, there is *still* the problem of the date of the order: October 31, 2023. That problem would be obviated by appellate counsel's description of the order appealed as the 180-day hearing judgment order, which, coupled with the State's affirmative representation

that it understood the orders sought to be appealed and was not prejudiced by any irregularities, would have rendered this a proper amended notice of appeal had appellate counsel sought leave to file an amended notice. Because appellate counsel did not seek leave and because the notice of appeal is otherwise untimely, we hold that it is ineffective to confer jurisdiction. Nevertheless, trial counsel's notice of appeal remains and fully confers jurisdiction over the 180-day hearing judgment order.

¶ 54                          B. Construction of Section 104-25(g)(2)

¶ 55    Defendant argues that the trial court erred in its February 28, 2023, judgment order from the (g)(2) hearing, finding that he "[c]onstitutes a serious threat to the public safety." Defendant contends that the erroneous finding was due to a misapplication of the law: having a mental health condition, he was eligible to be considered only for whether he was subject to involuntary admission and not whether he constituted a serious threat to the public safety. Defendant requests that, due to the court's error, order must be vacated.

¶ 56    Section 104-25(g)(2) provides, pertinently:

"If the defendant continues to be unfit to stand trial, the court shall determine whether he or she is subject to involuntary admission under the [Mental Health Code] or constitutes a serious threat to the public safety. If so found, the defendant shall be remanded to the [Department] for further treatment and shall be treated in the same manner as a civilly committed patient for all purposes, except that the original court having jurisdiction over the defendant shall be required to approve any conditional release or discharge of the defendant, for the period of commitment equal to the maximum sentence to which the defendant would have been subject had he or she been convicted in a criminal proceeding. During this period of commitment, the original court having jurisdiction over the defendant shall hold hearings under clause (i) of this paragraph (2). However, if the defendant is

remanded to the [Department], the defendant shall be placed in a secure setting unless the court determines that there are compelling reasons why such placement is not necessary." 725 ILCS 5/104-25(g)(2) (West 2022).

Subsection (g)(2) also includes reporting requirements every 90 days and hearing requirements every 180 days, which will be considered below.

¶ 57    Defendant's argument in this section of his brief centers on the interpretation of "whether [the defendant] is subject to involuntary admission under the [Mental Health Code] or constitutes a serious threat to the public safety." *Id.* Initially, we note that the State contends that this argument has been forfeited because it was not raised below. Our review of the record shows that, in fact, defendant did not raise the issue of whether the court properly applied this provision and whether the involuntary admission standard applies only to defendants who are unfit by virtue of a mental condition, while the public safety standard applies only to defendants who are unfit due to a physical condition. Ordinarily, this would result in forfeiture of the issue on appeal. See *People v. McNally*, 2022 IL App (2d) 180270, ¶ 22. However, the rule of forfeiture is an admonition to the parties and not a limitation on the reviewing court; we may overlook the technical forfeiture to maintain a sound body of precedent or where the interests of justice may require. *People v. Morgan*, 2023 IL App (4th) 220377, ¶ 19. Moreover, the issue, at least initially, presents purely a question of statutory interpretation, which we would review *de novo* (*People v. Lane*, 2023 IL 128269, ¶ 10), and it has been fully briefed by the parties, so the lack of consideration of the issue by the trial court is of considerably less import under these circumstances. Accordingly, despite the technical forfeiture, we choose to address defendant's argument.

¶ 58    Defendant begins his argument by observing that, if the question of a defendant's fitness involves his or her mental condition, the trial court is required to use a physician, clinical psychologist, or psychiatrist to evaluate the defendant and, if the question of a defendant's fitness

involves his or her physical condition, the court is required to use a physician along with any other necessary experts to evaluate the defendant. 725 ILCS 5/104-13(a), (b) (West 2022). Next, defendant observes that the treatment options vary depending on whether the defendant's unfitness is due to his or her mental or physical condition. If the defendant is unfit due to his or her mental condition, the court may order the defendant placed for secure treatment in the custody of the Department, or it may order the defendant placed for treatment in any other appropriate facility. *Id.* § 104-17(b). If the defendant has been placed in the custody of the Department, then he or she shall be placed in the most appropriate secure setting. *Id.* By contrast, if the defendant is unfit due to a physical condition, the court may place him or her under the supervision of the Department, which shall place the defendant in a suitable treatment program, or the court may place him or her in any appropriate treatment program. *Id.* § 104-17(c). The physically disabled defendant's treatment, in the custody of either the Department or some other entity, may be inpatient or outpatient as necessary. *Id.*

¶ 59    The cause of the unfitness does not affect the time frame for the restoration treatment or the conduct of the discharge hearing. It matters again, according to defendant, for the purposes of a subsection (g)(2) hearing. At that hearing, defendant argues, the court must determine whether the defendant whose unfitness is due to a mental condition is subject to involuntary admission under the Mental Health Code and whether the defendant whose unfitness is due to a physical condition constitutes a serious threat to the public safety. Thus, in defendant's reading of the statute and particularly section 104-25(g)(2), the clear import is that a defendant rendered unfit by a mental condition can be remanded to the Department's custody only if he or she is subject to

involuntary admission under the Mental Health Code.[3] Defendant concludes that the trial court erred because it followed the requirements that pertain to a defendant rendered unfit by a physical, not a mental, condition and determined that he constituted a serious threat to the public safety. We disagree.

¶ 60      The rules of statutory interpretation are longstanding and well established. The crux of statutory interpretation is to ascertain and give effect to the legislative intent. *People v. Maggette*, 195 Ill. 2d 336, 348 (2001). To do so, the court first considers the language (which provides the best means to determine the legislative intent) of the entire statute and interprets all of its relevant parts together. *Id.* Where the statutory language is clear, it will be given effect as written, and the court need not resort to other interpretive aids. *Id.* Indeed, we may not read into the statute exceptions, conditions, or limitations that the legislature did not express if the language is clear and unambiguous. *In re Christopher K.*, 217 Ill. 2d 348, 364 (2005).

¶ 61      Here, defendant argues that, because the legislature consistently separated the causes of unfitness throughout the provisions in the statute, it must have also intended to separate them in section 104-25(g)(2). This, however, is belied by the very provisions on which defendant relies. For example, in section 104-13, the legislature mandated the procedures around fitness examinations and devoted subsection (a) to defendants suspected of unfitness due to a mental condition and subsection (b) to defendants suspected of unfitness due to a physical condition. 725 ILCS 5/104-13 (West 2022). Similarly, in section 104-17, the legislature mandated the procedures around a defendant's treatment and devoted subsection (b) to defendants unfit due to a mental

---

[3]Defendant provides further argument about what such involuntary admission under the Mental Health Code entails, but this argument is not germane to our interpretation of the statute and section 104-25 of the Procedure Code.

condition and subsection (c) to defendants unfit due to a physical condition. *Id.* § 104-17. By contrast, subsection 104-25(g)(2) does not differentiate between whether the defendant's unfitness is due to mental or physical conditions. Sections 104-13 and 104-17 clearly illustrate that the legislature knew how to differentiate between unfitness caused by mental and physical conditions and to provide differing procedures depending on the cause of the unfitness. See *People v. Burge*, 2021 IL 125642, ¶ 28 (difference in verbiage in sections of a provision showed that the legislature knew how to show its intent to provide limitations for the scope of the statute). The lack of such differentiation in section 104-25(g)(2) strongly manifests the intent of the legislature: both the subject-to-involuntary-admission and the threat-to-public-safety determinations are available for the court to consider regardless of whether the defendant's unfitness is due to a mental or a physical condition. See *In re K.C.*, 186 Ill. 2d 542, 549-50 (1999) (the legislature signals different results were intended by using differences in the language). Thus, we reject defendant's limitations to section 104-25(g)(2), based on the clear and unambiguous language employed and considering the statute as a whole.

¶ 62    Instead, we believe that section 104-25(g)(2) says what it means and means what it says: "If the defendant continues to be unfit to stand trial, the court shall determine whether he or she is subject to involuntary admission under the [Mental Health Code] or constitutes a serious threat to the public safety." 725 ILCS 5/104-25(g)(2) (West 2022). There is no qualification in this provision related to the cause of the defendant's unfitness. The legislature clearly demonstrated that it knew how to craft such qualifications in sections 104-13 and 104-17. That it chose not to do so in section 104-25(g)(2) despite having done so elsewhere signifies that the trial court should consider all unfitness on an equal footing and determine whether the defendant satisfied either or both standards: subject to involuntary admission and constitutes a serious threat. See *K.C.*, 186 Ill. 2d at 549-50 ("by employing certain language in one instance and wholly different language in

another, the legislature indicates that different results were intended"). Thus, we conclude that the trial court did not err in interpreting section 104-25(g)(2) and, despite defendant's unfitness being due to a mental condition, the court could appropriately determine that he needed to be remanded to the Department's custody based solely on the determination that he constituted a serious threat to the public safety.

¶ 63    Our view is reinforced by the preprinted form order employed by the trial court. The preprinted form order tracks the statutory language and, accordingly, provides a decision tree for the court to consider. It begins with the issue of fitness and provides boxes for various dispositions if the defendant is found to be fit or found to be not fit. It directs the court to proceed to the next section if the defendant is found to be not fit. The second section deals with "if the Defendant Remains Unfit, Issue of Commitment." The court first considers under section 104-25(g)(2) whether there is clear and convincing evidence that the defendant (1) is "subject to involuntary admission under the [Mental Health Code (725 ILCS 5/104-25(g)(2)(ii) (West 2022))]" or (2) "constitutes a serious threat to the public safety." The form directs that the court may check one or both boxes corresponding to choices (1) and (2) when completing its order. The form continues with a second, alternative, branch: "It has not been shown by clear and convincing evidence that the defendant is subject to involuntary admission under the [Mental Health Code] or constitutes a serious threat to the public safety." The preprinted form order is fully in accord with our interpretation of article 104 and section 104-25(g)(2), and it is clear evidence that our interpretation was shared by the legal community at large.

¶ 64    Defendant argues that two cases demonstrate that section 104-25(g)(2) should take into account the cause of a defendant's unfitness and that only those defendants unfit due to physical conditions may be considered under the serious-threat clause. In *People v. Lang*, 76 Ill. 2d 311, 317 (1979), the defendant was charged in 1965 with the murder of a woman and found to be unfit

because he was deaf and unable to communicate. He was civilly committed as unfit, his treatment of sign language instruction was unsuccessful, and he faced the possibility of a lifetime civil commitment without ever being tried for the offense. *Id.* The defendant was released in 1971, however, when the murder charges were dismissed because of the death of the primary witness. *Id.*

¶ 65 In 1971, the defendant was charged with murdering a second woman in circumstances very similar to the first, and he was convicted after a jury trial. *Id.* The appellate court reversed the conviction because the defendant was unable to communicate with his counsel, and it remanded the matter for a fitness hearing. *Id.* at 318. The defendant was found unfit and placed into the custody of the Department. *Id.* The defendant's status appears to have been in a sort of limbo—his treaters did not believe he needed mental health treatment, but the court was reluctant to release him even though he no longer had a valid murder conviction. *Id.* at 319-20. In 1976, however, the defendant began to make progress learning sign language, and witnesses opined that it was possible that he might be restored to fitness within three to five years. *Id.* at 321-22.

¶ 66 Analyzing this situation, our supreme court noted that the Mental Health Code authorized involuntary admission only for those with a "mental disorder," but, in 1976,

> "[t]he 'mental disorder' requirement [had] been removed as a prerequisite of involuntary commitment. Hereafter, if a person is found unfit to stand trial, he should be considered to be mentally ill under the [Mental Health Code] unless his unfitness is due to a solely physical condition. If that person also meets the dangerousness requirement of the Code, he should be considered to be a 'person subject to involuntary admission.' [Citation.]" *Id.* at 326-27.

¶ 67 Defendant reads *Lang* to impose a distinction between defendants unfit due to a mental disorder and those unfit due to a solely physical condition. Defendant's reading truncates the

court's full reasoning to emphasize the court's statement about "a solely physical condition" and the context of the quotation, which is to deem an unfit person mentally ill unless the evidence shows there to be no mental health component of the unfitness. We further find that *Lang* is distinguishable on its facts: first, it does not analyze either the section 104-25(g)(2) provision at issue here or a predecessor or analog. Because the reasoning in *Lang* does not cover the same statutory ground as the issues in our case, *Lang* provides no guidance to interpreting section 104-25(g)(2). Second, the defendant in *Lang* was unable to communicate with his counsel as a result of a physical condition, deafness, coupled with the compounding problem of a lack of education and ability to use sign language. While the court did not address this as a mental issue, the lack of education clearly constituted a nonphysical condition contributing to the defendant's unfitness. Thus, in our view, by the nature of the issue confronting the defendant in *Lang*, he would not fall within the court's "solely physical condition" pronouncement and would be properly deemed mentally ill under the terms of the court's statement. Notwithstanding our view, however, the court took pains to note that, in addition to the unfit defendant being subject to involuntary admission if his unfitness involved his mental condition, an unfit defendant whose unfitness was *not* due to a mental condition could also be held by the Department if he met a standard of dangerousness. *Id.* at 331. When stated this way, we see that the court is balancing the community's safety against the specter of holding a defendant essentially forever, without statutory authority. Relevant to our case, we note that the legislature has taken to heart the court's concerns in *Lang* and balanced the various causes of a defendant's unfitness with the safety of the community and the defendant's rights. We do not see a conflict with our interpretation of section 104-25(g)(2) and our supreme court's resolution of the issues based on a different statutory regime.

¶ 68    Defendant also relies on *People v. Young*, 287 Ill. App. 3d 394 (1997), which was based on an analysis of section 104-25(g)(2). In *Young*, the defendant was charged with the aggravated

criminal sexual assault of a five-year-old girl, and he was found unfit due to the physical condition of deafness and lack of knowledge or understanding of any means to communicate with counsel. *Id.* at 395. The defendant exhibited no signs of a mental condition that would subject him to involuntary admission but was found to constitute a serious threat to public safety, which satisfied section 104-25(g)(2). *Id.* at 398. Defendant specifically relies on the following portion of *Young*:

> "The standard applicable in this case is established by the plain language of section 104-25(g)(2), which is cast in the disjunctive: if the defendant is unfit, the trial judge shall determine if he is subject to admission under the [Mental Health Code] 'or constitutes a serious threat to public safety.' [Citation.] The defendant is clearly not subject to commitment under the [Mental Health Code]. *Because the commitment provisions of the [Mental Health Code] apply only to mentally ill people and because a mentally ill person is already subject to commitment under section 1-119 of the [Mental Health Code (405 ILCS 5/1-119 (West 1994))] if his condition renders him dangerous, we conclude that the portion of the sentence after the word 'or' must refer to circumstances in which a person is unfit, but for reasons of physical and not mental disability, a distinct condition provided for in section 104-10 and elsewhere in the Code*." (Emphasis added.) *Id.* (emphasized text quoted by defendant in his argument).

¶ 69 Defendant argues that *Young* unqualifiedly supports his interpretation of section 104-25(g)(2). We disagree. *Young* implicitly equates the standard for involuntary admission under the Mental Health Code with, "constitutes a serious threat to the public safety," in section 104-25(g)(2). However, the standard for involuntary admission at that time was the reasonable expectation that the person would "inflict serious physical harm upon himself or herself or another in the near future." 405 ILCS 5/1-119(a)(1) (West 1994). Contrast this with section 104-25(g)(2), which stated, as it does today, that, for a defendant to be remanded to the Department's custody,

the trial court must determine that the defendant "is subject to involuntary admission under the [Mental Health Code] or constitutes a serious threat to the public safety." 725 ILCS 5/104-25(g)(2) (West 1994). The use of differing language in the two provisions indicates that different results are intended. *K.C.*, 186 Ill. 2d at 549-50. Thus, when the *Young* court implicitly assigned the same meaning to the phrase, "constitutes a serious threat to the public safety"—from section 104-25(g)(2)—and the phrase, "is reasonably expected to inflict serious physical harm upon himself or herself or another in the near future"—from section 1-119 of the Mental Health Code in effect at the time—it committed a most fundamental interpretive error. See *id.* (by employing different language, the legislature indicates that it intends different results). *Young* erroneously resolves the problem by adding in meaning that the legislature did not express, namely, the segregation of the avenues of determining whether an unfit defendant will be remanded to the Department based on the cause of unfitness. Because *Young* errs as a matter of basic statutory interpretation, we will not follow it.

¶ 70    Defendant also applies the *Young* rationale to argue that, because the involuntary admission determination involves unfitness due to a mental condition and specifically invokes section 1-119 of the Mental Health Code, the more specific language of the Mental Health Code should control over the more general language of the "serious threat" language in section 104-25(g)(2) of the Procedure Code. We reject defendant's argument because it relies on *Young*, which we believe erroneously interpreted section 104-25(g)(2) by adding limitations and conditions the legislature did not express.

¶ 71    Defendant also contends that our interpretation of section 104-25(g)(2) causes due process concerns, relying on *People v. Lang*, 113 Ill. 2d 407, 456 (1986) (*Lang II*). The portion of *Lang II* defendant cites involved a consideration of whether "mental illness" in section 1-119 of the Mental Health Code (defining "person subject to involuntary admission") was unconstitutionally vague.

*Id.* at 454. The court held that it was not unconstitutionally vague because, while the term "mentally ill" was not defined in the relevant portion of the Mental Health Code, it clearly included only those persons who were both mentally ill and posed a danger to themselves or the public and excluded persons who may have been mentally ill but did not pose such a danger. *Id.* at 455. The court noted that section 1-119 required "not only a finding that a person is 'mentally ill' but also that, '*because of his illness*,' he is reasonably expected to be a serious danger to himself or others." (Emphasis in original.) *Id.* at 455-56. Defendant argues that, because the "serious threat" standard of section 104-25(g)(2) does not include the requirement that, because of the defendant's mental illness, he or she is reasonably expected to engage in conduct placing him- or herself or others in reasonable expectation of being physically harmed, applying the serious threat standard to a defendant with a mental illness "decouples the mental illness from the dangerous [*sic*] determination, thereby raising due process concerns."

¶ 72     First, we cannot see that *Lang II* speaks to due process concerns. The issue in *Lang II* is whether section 1-119 of the Mental Health Code is unconstitutionally vague, not whether section 104-25(g)(2) of the Procedure Code violates due process. Second, defendant's argument loses sight of the subject of section 104-25(g)(2): the disposition of an unfit defendant. Section 104-25(g)(2) allows the court to remand to the Department's custody an unfit defendant who (1) is subject to involuntary admission under section 1-119 of the Mental Health Code or (2) constitutes a serious threat to the public safety. A mentally ill defendant who may not qualify for involuntary admission may nevertheless constitute a serious threat to the public safety, and defendant does not address this scenario. Indeed, this is the basis on which the State proceeded in this case, and this is the basis on which the trial court rendered its judgment. Defendant does not explain how the trial court's decision offends due process, and we are under no responsibility to supply defendant's missing explanation. Last, defendant characterizes the *Young* rationale and his interpretation of

section 104-25(g)(2) as harmonizing conflicting statutory provisions, thereby avoiding any due process concerns. We note that sections 1-119 and 104-25(g)(2) cover distinct topics: section 1-119 deals with mentally ill persons, while section 104-25(g)(2) deals with unfit defendants. These topics are not coextensive: not all mentally ill persons are unfit to stand trial and not all unfit defendants are mentally ill under the terms of section 1-119. Thus, not only does defendant offer no explanation of how due process may be implicated, but the statutes do not conflict.

¶ 73    We therefore reject defendant's interpretive argument and hold that the trial court's understanding and interpretation of section 104-25(g)(2) was correct. The court was free to determine whether to remand defendant to the Department's custody on either ground: being subject to involuntary commitment or constituting a serious threat to the public safety.

¶ 74    Defendant also argues that the State failed to prove that defendant was subject to involuntary admission under the Mental Health Code. Defendant's argument on this point is tied to his interpretive argument: the only avenue available to the State was to prove that defendant was subject to involuntary admission. Defendant does not argue that the evidence was insufficient to prove that he constituted a serious threat to the public safety and instead argues only that the evidence adduced does not satisfy the requirements of section 1-119 of the Mental Health Code. Therefore, we hold that the trial court's judgment stands unassailed, and we need not address defendant's contentions further.

¶ 75                              C. 180-Day Hearing

¶ 76  Defendant argues that the trial court erred in determining at the conclusion of the 180-day hearing that he needed inpatient mental health treatment. Section 104-25(g)(2) provides timelines for further evaluations of a defendant's fitness. Every 90 days, the facility director where the defendant is being treated shall file a treatment plan and include opinions as to whether the defendant has been rendered fit to stand trial and whether the defendant is currently subject to

involuntary admission, in need of inpatient mental health treatment, or in need of outpatient mental health treatment. 725 ILCS 5/104-25(g)(2) (West 2022). The court or the parties may request a treatment plan review hearing, upon which the court is required to determine whether the treatment plan complies with the statutory requirements. *Id.*

¶ 77    In addition, "180 days after a defendant is remanded to the [Department], under paragraph (2), and every 180 days thereafter for so long as the defendant is confined under the order entered thereunder, the court shall set a hearing" and provide notice to all interested and necessary parties. *Id.* § 104-25(g)(2)(i). The court, the defendant, or the State may request an independent examination of the psychiatric or psychological examination of the defendant, and the report shall be considered at the 180-day hearing. *Id.* Upon holding the hearing,

"[t]he court shall make a finding as to whether the defendant is:

(A) subject to involuntary admission; or

(B) in need of mental health services in the form of inpatient care; or

(C) in need of mental health services but not subject to involuntary admission nor inpatient care." *Id.*

The court's findings must be established by clear and convincing evidence, and the State bears both the burden of going forward with the evidence and the ultimate burden of proof. *Id.* For the purposes of this provision, the terms "subject to involuntary admission," "in need of mental health services in the form of inpatient care," and "in need of mental health services but not subject to involuntary admission nor inpatient care" shall have the same meanings as in section 5-2-4 of the Unified Code of Corrections (Code of Corrections) (730 ILCS 5/5-2-4 (West 2022)). 725 ILCS 5/104-25(g)(2)(ii) (West 2022). Pertinently, a defendant "in need of mental health services in the form of inpatient care" is defined as one "who, due to mental illness, is reasonably expected to inflict serious physical harm upon himself or another and who would benefit from inpatient care

or is in need of inpatient care." 730 ILCS 5/5-2-4(a-1)(B) (West 2022). The purpose and the subject of a 180-day hearing is distinct from the fitness proceedings elsewhere described in article 104 of the Procedure Code; the 180-day hearing is concerned only with whether the defendant is subject to involuntary admission or in need of mental health services in the form of either inpatient care or otherwise. *People v. Olsson*, 2012 IL App (2d) 110856, ¶ 18.

¶ 78    Defendant argues that the trial court erred in determining that defendant was in need of inpatient mental health treatment following the 180-day hearing, because Mohammed's testimony did not establish the necessary connection between defendant's mental illness and the reasonable expectation that he would inflict physical harm upon himself or others. We disagree.

¶ 79    Defendant does not specify the standard of review applicable to this issue. Defendant is asking that we consider whether the State sustained its burden of proof and whether the trial court was able to have determined, by clear and convincing evidence, that defendant was in need of inpatient mental health treatment. This asks us to evaluate the trial court's assessment of the evidence adduced at the 180-day hearing. Generally, such an issue is reviewed under the manifest-weight-of-the-evidence standard, and we do so here. See *People v. Barichello*, 305 Ill. App. 3d 13, 25 (1999) (a trial court's judgment regarding whether a person is subject to involuntary commitment will not be reversed unless "manifestly erroneous").

¶ 80    Turning to the 180-day hearing, Mohammed testified that, after being remanded to the Department's custody following the February 28, 2023, order, defendant began refusing to meet with him as a treating psychiatrist and was refusing to avail himself of the treatment opportunities provided. Defendant would no longer attend his treatment team's meetings or his counseling sessions. Defendant refused to consider or take medication and displayed no insight into his condition. Defendant displayed a disturbed sleep schedule, with difficulty falling asleep and habitually staying up until very late, perhaps for the purpose of avoiding having to interact with

the other patients. Defendant continued to refuse to acknowledge that he was mentally ill, and his delusion—the cause of his problems was the green goo that had been injected into his head—remained untreated and unabated.

¶ 81    Mohammed also testified that defendant's aggression was escalating even though he was being held in a secure and structured setting. Defendant had verbal conflicts with other patients after years of being free of such incidents. Specifically, in July 2023 and then in August 2023, defendant engaged in verbal altercations. In the July incident, security was called to de-escalate the situation, and in the August incident, defendant threatened to break another patient's television, apparently in response to racial name-calling from the other patient.

Mohammed opined that, if defendant were released from inpatient treatment, he posed a safety risk to the community and could be expected to escalate his behavior into physical violence. Mohammed based this opinion on the totality of his experience with treating defendant and defendant's treatment and legal files. Mohammed also based his opinion on the fact that defendant had been diagnosed with a major mental illness and consistently over time had denied the fact of that major mental illness. Defendant refused all treatment, medication, and counseling. In Mohammed's opinion, defendant's refusals constituted aggressive actions, defendant's criminal offenses were, at the least, also aggressive actions if not outright acts of violence, and these circumstances were factors to consider in predicting whether defendant would engage in future acts of physical violence. For the previous three years, defendant had also been held in a secure, controlled, and structured environment, yet he displayed aggressive behaviors during that time and, within several weeks of Mohammed's testimony, had twice gotten into verbal altercations with other patients.

¶ 82    The trial court accepted Mohammed's testimony and determined that defendant was in need of inpatient mental health treatment. The court agreed with Mohammed's testimony and

noted that defense counsel had conducted a thorough and effective cross-examination that had not shaken Mohammed's opinions or explanations, even though it highlighted that defendant had not engaged in physically violent conduct. The court also expressed concern that defendant's offenses involved a loaded and cocked handgun, which defendant had not been able to use before his arrest.

¶ 83    We therefore hold that the trial court's determination following the 180-day hearing that defendant was in need of inpatient mental health treatment was not against the manifest weight of the evidence.

¶ 84    Defendant argues that Mohammed's testimony did not demonstrate that he was likely to inflict serious physical harm upon himself or others. Rather, defendant had engaged in solely verbal altercations, and the testimony did not include a nexus between the behaviors defendant exhibited at the Elgin Mental Health Center and the possibility of defendant causing future serious physical harm. We disagree.

¶ 85    We note that Mohammed was extensively, thoroughly, and effectively cross-examined, and the trial court was well aware of the points defendant now argues. Mohammed replied that past conduct predicts future conduct and noted the accelerating escalation of aggressive conduct by defendant. Mohammed noted that this increase in severity and frequency was occurring despite defendant being held in a very controlled and structured environment. From this, Mohammed reasonably extrapolated that, if the structure and controls were removed from defendant, who refused to seek treatment when it was readily available and refused to acknowledge his mental health issues at all, then it was likely that the escalation would continue as his mental health continued to be an issue and defendant was subjected to increasingly stressful stimuli in his new, uncontrolled and unstructured, environment. Mohammed remained confident in this opinion, despite defense counsel's thorough and effective cross-examination. Moreover, this opinion supported the trial court's judgment, and it was solidly based on the evidence presented. The

evidence demonstrated that defendant was reasonably expected to cause serious physical harm to himself or others even though he had not committed overt acts of violence during his time at the Elgin Mental Health Center. Accordingly, we reject defendant's contention.

¶ 86    Finally, defendant argues that the trial court flipped the burden of going forward with the evidence and of proof from the State to defendant when it told defendant that he had the keys to his freedom and discussed the desirability of defendant complying with treatment recommendations, including the administration of psychotropic medications. According to defendant, by saying this, the court demonstrated that, so long as defendant refused to accept treatment, including medication, the court would not deem him either fit or eligible for outpatient treatment or release. We understand defendant's contention, but we disagree with its import.

¶ 87    In its remarks at the February 28, 2023, hearing, the trial court exhorted defendant to comply with the Department's treatment recommendations, noting that, in a real sense, defendant held the keys to his freedom and his future. Again, in its remarks following the denial of the motion to reconsider, the court encouraged defendant to comply with the offered treatment, repeating that he held the keys to his freedom. Following the 180-day hearing, the court again repeated its encouragement, using similar keys-to-your-freedom language. Based on this established context, the court was not flipping the burden of proceeding or proof from the State to defendant; rather, it was again trying to encourage and motivate defendant to participate in treatment so he would progress and attain fitness. While the court did use the "keys to your future" language, it did so to provide defendant with positive encouragement and was not a comment on any legal principles the court was using in its judgment. We reject defendant's contention. Accordingly, we hold that the trial court's judgment following the 180-day hearing was not against the manifest weight of the evidence.

¶ 88                                    III. CONCLUSION

¶ 89    For the foregoing reasons, we affirm the judgment of the circuit court of Lake County.

¶ 90    Affirmed.

---

***People v. Zerbst*, 2024 IL App (2d) 230232**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 19-CF-433; the Hon. Paul B. Novak, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | John W. Radosevich and Katherine A. McCollum, of Del Re Law Group, of Waukegan, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Eric F. Rinehart, State's Attorney, of Waukegan (Patrick Delfino, Edward R. Psenicka, and Stephanie Hoit Lee, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |